UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LOGAN J. SASSE,

Plaintiff,

-against-

THE DERECH SHALOM CENTER, INC., SERENITY HEALTHCARE SERVICES LLC, ABRAHAM JOSHUA KRISPIN, and BEN SCHLOSSBERG,

Defendants.

25-CV-3500 (JGLC)

**OPINION AND ORDER**

JESSICA G. L. CLARKE, United States District Judge:

After Plaintiff Logan Sasse was fired from his job as a media producer, he brought this action against his former employers alleging violations of the Fair Labor Standards Act and New York Labor Law. When Defendants answered Sasse's complaint, they brought counterclaims against him: They alleged that Sasse retained company property—both physical and digital—and misused confidential credentials to benefit himself and his new, competing company. Sasse now moves to dismiss all five of Defendants' Counterclaims.

The Court finds that, at this stage, Defendants—now Counter-Plaintiffs—have standing to assert their Counterclaims; the Court possesses subject matter jurisdiction over all five Counterclaims; and Counter-Plaintiffs have stated all five Counterclaims. Accordingly, the Court DENIES Sasse's motion to dismiss.

## BACKGROUND

Unless otherwise noted, the "following facts are drawn from the allegations in the Counter-Plaintiffs' Counterclaims and assumed to be true for the purposes of this motion to dismiss." *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 197 (S.D.N.Y. 2008) (citations omitted).

Plaintiff Logan Sasse ("Counter-Defendant" or "Sasse") brought this action against Defendants The Derech Shalom Center, Inc. ("DSC"), Serenity Healthcare Services LLC ("Serenity"), Abraham Joshua Krispin, and Ben Schlossberg (collectively, "Defendants" or "Counter-Plaintiffs") alleging violations of the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL"). ECF No. 1 ("Compl."). He also included Montebello Media LLC ("Montebello Media") as a Defendant in his initial Complaint. *See id.* at 1. Sasse claimed that Defendants—his former employers—did not (1) properly pay him overtime wages, (2) pay him for his unused vacation days or for the last four weeks of his employment, and (3) properly furnish him with wage notices throughout his employment. Compl. ¶¶ 4, 99–141. Sasse also brought a breach of contract claim alleging that Defendants failed to reimburse him for equipment and other materials he had purchased for Defendants' benefit during his employment. *Id.* ¶¶ 142–47.

Defendants answered and asserted thirteen counterclaims against Sasse. ECF No. 18. Plaintiff—now also a Counter-Defendant—then filed an Amended Complaint, which dropped his breach of contract claim and added a retaliation claim stemming from Defendants' counterclaims. ECF No. 19 ("AC"); *see* ECF No. 32 ("MTD") at 2. He also no longer included Montebello Media as a Defendant. *See* AC at 1. Defendants—now Counter-Plaintiffs—answered the Amended Complaint and brought forth the same thirteen counterclaims against Sasse. ECF No. 25. Sasse moved to dismiss all thirteen counterclaims. ECF No. 27.

On January 27, 2026, Counter-Plaintiffs filed an Amended Answer that narrowed their counterclaims to five. ECF No. 30 ("Am. Answer") at 19–33 ("Counterclaims"). Counter-Plaintiffs assert the following five Counterclaims against Sasse: (1) violating the Computer Fraud and Abuse Act ("CFAA") pursuant to 18 U.S.C. §§ 1030(a)(2)(C), 1030(a)(5)(B)–(C), and 1030(g); (2) conversion; (3) misappropriation of confidential information; (4) breach of fiduciary

duty/faithless servant; and (5) violating the Defend Trade Secrets Act ("DTSA") under 18 U.S.C. § 1836(b). Counterclaims ¶¶ 44–73.

Specifically, Counter-Plaintiffs contend that their Counterclaims "arise from [Sasse]'s acts of disloyalty, conversion, and unauthorized access to [their] proprietary systems and materials during and after his employment," as well as Sasse's "subsequent misuse of confidential credentials, removal of company property, and coordination with others to obtain and exploit [Counter]-Plaintiffs' intellectual and digital assets." *Id.* ¶¶ 2–3. Sasse was "forming a competing company while still employed," Counter-Plaintiffs explain, so he "retain[ed] company property[] and us[ed] confidential materials" to further that aim—in other words, "for personal benefit." *Id.* ¶ 65.

In August 2022, Serenity hired Sasse as a Production Assistant. Counterclaims ¶ 5. By mid-2024, Sasse had been promoted to Media Manager and was "managing junior media staff, directing content development, overseeing production schedules, and exercising discretion over media strategy." *Id.* Sasse worked for Defendants until on or about August 19, 2024. AC ¶ 67; ECF No. 44 ("Opp.") at 1. On August 16, 2024, "in anticipation of his own termination following documented performance issues, Sasse emailed HR with a proposal to purchase certain equipment he was retaining from the company in lieu of final paychecks." Counterclaims ¶ 6. In so doing, he relayed "the precise amount he believe[d] the company owe[d] him as of his termination date ($1,815), and voluntarily offer[ed] to forgo that entire amount in exchange for permanent ownership of the equipment." *Id.* ¶ 7.

Around that same time, Sasse also sent messages that reflected what Defendants describe as "a scheme to 'clock in'" and "get paid whether or not [he was] actually working": "If we are

there, they legally have to pay us for the hours we are at that building," Sasse wrote. *Id.* ¶ 12. "Even if we are 'working' or not, the second we clock in, they have to pay us," he added. *Id.*

Once Sasse was no longer employed by Defendants, on August 21, 2024, he again "admit[ted] to possessing Montebello Media's production equipment and digital files," stating that he "still ha[d] the Zoom recorder, the rodecaster, and both drives." *Id.* ¶ 21. "They're not getting any of that back until I know what the next move is," he explained. *Id.* Three days later, on August 24, 2024, Sasse noted that he "grabbed the final cut folders before [he] left" and "backed them onto [his] own SSD." *Id.* And he referenced having continued access to the company's active systems, stating: "I can still log into the backend . . . not sure how long before they kill that off." *Id.*

A few days later, on August 27, 2024, Sasse texted a former colleague named Avigail Gluck about removing from Defendants' office "a company hard drive that contain[ed] intellectual property belonging to Montebello Media." *Id.* ¶ 14. Sasse explained that he would be "borrowing" the drive "then putting it back." *Id.* Defendants contend that these August 27, 2024 text messages "reveal[] a coordinated effort to identify, remove, conceal, and potentially clone or swap out drives containing production content that had not yet been backed up." *Id.*

That same day, Sasse texted Montebello Media's former Maintenance Manager, Xavier Powell, "to assist in locating, accessing, and possibly retrieving" the hard drive. *Id.* ¶ 19. He texted Gluck that "Xavier is getting us the drive. Don't tell anyone." *Id.* ¶ 16. Defendants then point to an image that, upon information and belief, is "timestamped" from August 27, 2024, and depicts "a G-Technology external hard drive—company-owned—connected to an active computer system." *Id.* ¶ 20. The image, Defendants explain, "captures the drive physically in use, with visible access to internal folders and project files," and "strongly suggest[s] live file

manipulation or data extraction." *Id.* The drive was labeled "Property of Montebello Media." *Id.* ¶ 27.

Sasse also messaged someone named Yael Zola "a spreadsheet containing sensitive account information for dozens of Montebello Media and Serenity-branded digital platforms," including "login references for Instagram, Twitter, LinkedIn, Canva, TikTok, Adobe CC, Envato Elements, and associated business email accounts." *Id.* ¶ 22. His message read: "Here's how this is going to play out. Serenity will transfer Montebello Media's domain and website to us along with Global Frontiers domain and website. In return, Serenity will get their access back... I'll give you two hours." *Id.* ¶ 24. Sasse had also been emailing someone named Avi Kahan "outlining steps to re-obtain control of the MontebelloMedia.com domain through Squarespace." *Id.* ¶ 26. Sasse explained that "once the domain was secured 'we will have everything.'" *Id.*

On August 30, 2024, "HR Director Tiana Hernandez began receiving numerous calls from unknown numbers referencing a Craigslist advertisement listing her personal cell phone as the contact for a vehicle sale." *Id.* ¶ 29. The advertisement used contact information "drawn from internal HR records." *Id.* ¶ 30. Serenity reported the incident to the police. *Id.* "Over the following days, Hernandez logged more than 100 calls per day and forwarded screenshots and voicemails to the investigating officer." *Id.* ¶ 31.

In January of the following year, "Hernandez identified Sasse as the individual responsible" for the Craigslist incident "and described continuing harassment." *Id.* ¶ 33. HR correspondence from that month also "shows Sasse discussing payroll access and acknowledging that he could view paystubs through the [company's] Viventium system." *Id.* ¶ 34. And on April 6, 2025, "Serenity's Employee Self-Service portal recorded a login under the username

'lsasse71@gmail.com'"—long after Sasse had been fired and his account had been marked "Inactive." *Id.* ¶ 35.

On February 17, 2026, Sasse moved to dismiss Defendants' Counterclaims. ECF No. 31. He makes three arguments advancing dismissal: under Rule 12(b)(1), he argues that (1) Counter-Plaintiffs lack standing to bring any of their Counterclaims, and (2) that the Court lacks subject matter jurisdiction over the state law Counterclaims; and under Rule 12(b)(6), he contends that (3) Counter-Plaintiffs have failed to state their CFAA, DTSA, and conversion claims. *See* MTD. Counter-Plaintiffs opposed the motion on March 31, 2026. Opp. Counter-Defendant replied on April 7, 2026. ECF No. 48 ("Reply"). On April 10, 2026, Counter-Plaintiffs filed a supplementary letter in order to address one of Sasse's arguments and, in the alternative, seek leave to amend their Amended Answer. ECF No. 49 ("Letter").

Having reviewed the parties' filings, and for the reasons stated below, the Court DENIES Counter-Defendant's motion to dismiss. Counter-Plaintiffs' federal CFAA and DTSA Counterclaims, as well as their faithless servant, conversion, and misappropriation of confidential information Counterclaims under New York law, all survive.

## LEGAL STANDARDS

The Court sets forth the legal standards under Federal Rules of Civil Procedure 12(b)(1) (lack of subject matter jurisdiction) and 12(b)(6) (failure to state a claim) because those are the standards applicable to the Court's analysis. Because a "motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint," the standards laid out below apply to the Counter-Plaintiffs and to the Counter-Defendant just as they would to a plaintiff asserting claims against a defendant in a complaint. *CDC Newburgh Inc. v. STM Bags, LLC*, 692 F. Supp. 3d 205, 219 (S.D.N.Y. 2023) (citation omitted).

## I. Rule 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). The party "asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.* (internal citation omitted). Thus, in resolving a motion to dismiss for lack of subject matter jurisdiction, the court "must accept as true all material factual allegations in the [counter-claims]" but "may not draw any jurisdictional inferences in favor of the [counter-]plaintiff." *Blecher v. Holy See*, 146 F.4th 206, 216 (2d Cir. 2025) (quoting *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004); citing *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998)).

"A Rule 12(b)(1) motion may be either facial or fact-based." *Lugo v. City of Troy*, 114 F.4th 80, 87 (2d Cir. 2024). "[A] [counter-]defendant is permitted to make a fact-based Rule 12(b)(1) motion" by "proffering evidence beyond the [p]leading[s]," in opposition to which a counter-plaintiff must submit their own controverting evidence when the evidence reveals "factual problems in the assertion of jurisdiction." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016) (cleaned up). "However, the [counter-]plaintiffs are entitled to rely on the allegations in the [p]leading if the evidence proffered by the [counter-]defendant is immaterial." *Id.* "Where, as here, the [counter-]defendant moves for dismissal under Rule 12(b)(1), as well as on other grounds, the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined." *Wise v. Combe Inc.*, 724 F. Supp. 3d 225, 232–33 (S.D.N.Y. 2024) (quoting *Saint-Amour v. Richmond Org., Inc.*, 388 F. Supp. 3d 277, 286 (S.D.N.Y. 2019)).

**II. Rule 12(b)(6)**

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must "accept[] all factual claims in the complaint or counterclaim as true, and draw[] all reasonable inferences in the plaintiff's favor." *Garvey v. Face of Beauty LLC*, 634 F. Supp. 3d 84, 90 (S.D.N.Y. 2022) (quoting *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014)) (cleaned up). A claim will survive a Rule 12(b)(6) motion only if the counter-plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 678. If a complaint does not state a plausible claim for relief, it must be dismissed. *Id*. at 679.

**DISCUSSION**

This discussion proceeds in six parts. First, the Court determines that Counter-Plaintiffs have standing at this stage of the litigation to assert their Counterclaims. Second, the Court evaluates the three state law Counterclaims—faithless servant, conversion, and misappropriation of confidential information—and concludes that only the faithless servant claim is a compulsory counterclaim. Nevertheless, the Court exercises supplemental jurisdiction over the two permissive Counterclaims: for conversion and misappropriation of confidential information. Third, the Court determines that the Counter-Plaintiffs have stated a CFAA claim. Fourth, the

Court concludes that the Counter-Plaintiffs have stated a DTSA claim. Fifth, the Court finds that the Counter-Plaintiffs have stated a conversion claim. And sixth, the Court concludes that the Counter-Plaintiffs have stated a claim for misappropriation of confidential information.

## I. At This Stage, Counter-Plaintiffs Have Standing

Sasse argues that Defendants do not have standing to asset their Counterclaims because their allegations involve property and information owned by Montebello Media—which is no longer a party to this lawsuit. *See* MTD at 20–22. At this stage of the litigation, however, where the Court must accept as true all of the material factual allegations, the Court concludes that Counter-Plaintiffs have standing to assert their Counterclaims.

"[P]arties pressing claims in federal courts must have standing to bring their claims to ensure that there is an actual case or controversy under Article III" of the United States Constitution. *Wise v. Combe Inc.*, 724 F. Supp. 3d 225, 233 (S.D.N.Y. 2024) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). The "'irreducible constitutional minimum' of standing consists of three elements": "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan*, 504 U.S., at 560). An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Wise*, 724 F. Supp. 3d at 233 (quoting *Lujan*, 504 U.S. at 560). To survive a motion to dismiss, a pleading must only allege facts that "affirmatively and plausibly suggest" standing. *Lowell v. Lyft, Inc.*, 352 F. Supp. 3d 248, 255 (S.D.N.Y. 2018) (citing *Boelter v. Hearst Commc'n, Inc.*, 192 F. Supp. 3d 427, 437 (S.D.N.Y. 2016)).

Here, Counter-Plaintiffs have alleged that Sasse sought to remove "*a company* hard drive" from their office. Counterclaims ¶ 14 (emphasis added). They have explained that "Sasse emailed HR with a proposal to purchase certain equipment he was retaining *from the company* in lieu of final paychecks." *Id.* ¶ 6 (emphasis added). And they have stressed that Sasse was "forming a competing company while still employed" at Serenity. *Id.* ¶ 65. These pleadings are enough on their own to "affirmatively and plausibly suggest" that Defendants—not just Montebello Media—suffered an actual, concrete and particularized injury as a result of Sasse's actions. *Lowell*, 352 F. Supp. 3d at 255.

Counter-Plaintiffs also highlight that Sasse's own original complaint forecloses his standing argument—because he underscores that Montebello Media and Defendants were "part of the same corporate enterprise." Letter at 2; *see* Compl. ¶¶ 16, 23, 30, 35–36, 52–53, 65. At this stage, then, taking Counter-Plaintiffs' allegations as true, Counter-Plaintiffs have standing to assert their Counterclaims.

## II. The Court Has Subject Matter Jurisdiction Over All Three State Law Counterclaims

"[S]ubject matter jurisdiction is an unwaivable *sine qua non* for the exercise of federal judicial power." *Curley v. Brignoli, Curley & Roberts Assocs.*, 915 F.2d 81, 83 (2d Cir. 1990). Consistent with that proposition, Rule 12(h)(3) of the Federal Rules of Civil Procedure provides that "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."

"Where 'there is no independent basis of federal jurisdiction over . . . counterclaims,' the 'question is whether the . . . counterclaims are compulsory or are permissive.'" *Finley v. Przybylowski*, No. 25-CV-4383 (JAV), 2026 WL 1018997, at *2 (S.D.N.Y. Apr. 15, 2026) (quoting *United States ex rel. D'Agostino Excavators, Inc. v. Heyward-Robinson Co.*, 430 F.2d

1077, 1080 (2d Cir. 1970) (collecting cases)). "Compulsory counterclaims do not require an independent grant of jurisdiction." *Est. of Close v. Cigna Health & Life Ins. Corp.*, No. 22-CV-7449 (RA), 2023 WL 8846562, at *2 n.1 (S.D.N.Y. Dec. 21, 2023). "On the other hand, permissive counterclaims do require an independent jurisdictional source," *Prosper v. BronxWorks, Inc.*, No. 25-CV-4956 (AS), 2026 WL 1413582, at *2 (S.D.N.Y. May 20, 2026) (citing *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 210–13 (2d Cir. 2004))—"the Court must then determine whether it can and should exercise supplemental subject matter jurisdiction over the state law counterclaim pursuant to 28 U.S.C. § 1367(a)," *Berry v. City of New York*, No. 22-CV-5969 (MMG), 2024 WL 1908105, at *2 (S.D.N.Y. May 1, 2024).

Here, the Court concludes that Counter-Plaintiffs' breach of fiduciary duty/faithless servant counterclaim—which the Court construes as a faithless servant counterclaim—is a compulsory counterclaim, whereas Counter-Plaintiffs' conversion and misappropriation of confidential information claims are permissive counterclaims. *See* Counterclaims ¶ 66 ("Such conduct constitutes willful disloyalty under New York's faithless-servant doctrine, entitling Counterclaim-Plaintiffs to forfeiture of compensation earned during the period of disloyalty."). However, the Court finds that it should exercise supplemental jurisdiction over the latter two Counterclaims pursuant to 28 U.S.C. § 1367(a) ("Section 1367(a)"). Accordingly, the Court possesses subject matter jurisdiction over all three state law Counterclaims.

**A. The Faithless Servant Counterclaim Is Compulsory and Survives**

As discussed, the Federal Rules of Civil Procedure "divide counterclaims into two basic categories—compulsory and permissive." *Berry*, 2024 WL 1908105, at *2 (citing Fed. R. Civ. P. 13). "A compulsory counterclaim 'arises out of the transaction or occurrence that is the subject matter of the opposing party's claim,' which in this Circuit occurs when there is a 'logical

relationship' between the counterclaim and the main claim." *Rosario v. Int'l Auto Mall & Leasing Ctr., Inc.*, No. 12-CV-4059 (ALC), 2013 WL 1144893, at *2 (S.D.N.Y. Mar. 19, 2013) (quoting *Jones*, 358 F.3d at 209); *see also Phoenix Bulk Carriers, Ltd. v. Am. Metals Trading, LLP*, 742 F. Supp. 2d 486, 489 (S.D.N.Y. 2010) (quoting *Adam v. Jacobs*, 950 F.2d 89, 92 (2d Cir. 1991)) ("Whether a counterclaim is compulsory under Federal Rule 13(a) is determined by 'whether a logical relationship exists between the claim and the counterclaim and whether the essential facts of the claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit.'"). "Any counterclaim that is not compulsory" pursuant to Rule 13(a) "is considered 'permissive.'" *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 467 (S.D.N.Y. 2008) (quoting Fed. R. Civ. P. 13(b)).

Here, Counter-Plaintiffs argue that all three of their state law Counterclaims share a logical relationship to Sasse's FLSA claims—and thus arise out of the same transaction or occurrence—because each requires the Court to examine "the same underlying conduct, records, and time period" when assessing Sasse's hours, pay, and access to company systems. Opp. at 5–7. Their argument is only convincing with regard to one such counterclaim: the faithless servant counterclaim.

As to Sasse's hours, Counter-Plaintiffs rely entirely on Sasse's message articulating his alleged "scheme to 'clock in'" and "get paid whether or not [he was] actually working" to argue that their state law Counterclaims share a logical relationship with Sasse's FLSA claims. Counterclaims ¶ 12; *see id*. Although Sasse is correct that Counter-Plaintiffs never allege in their Counterclaims or affirmative defenses that he "was clocking in and not working," Reply at 2, Counter-Plaintiffs make clear that their faithless servant counterclaim is premised on Sasse "forming a competing company while still employed, retaining company property, and using

confidential materials for personal benefit," Counterclaims ¶ 65. As a result, Counter-Plaintiffs argue, Sasse should be disgorged of the salary at issue in his FLSA claim. *Id.* ¶ 67.

Similarly, as to Sasse's pay, Counter-Plaintiffs convincingly argue that Sasse's August 16, 2024 email "fixing his total outstanding wages at $1,815" is logically related to Sasse's FLSA claims. Opp. at 6 (citing Counterclaims ¶¶ 6–7). In both of these instances, "the underlying facts of [Sasse's] wage and hour claims are intertwined with those of" Counter-Plaintiffs' faithless servant counterclaim. *Roytlender v. D. Malek Realty, LLC*, No. 21-CV-52 (JMW), 2024 WL 3566998, at *11 (E.D.N.Y. July 29, 2024) (emphasis omitted). Counter-Plaintiffs' argument that their Counterclaims are logically related to Sasse's FLSA claims because both involve the same HR computer systems, by contrast, is unavailing. *See* Opp. at 7.

More than anything, though, Sasse's FLSA claims bear a logical relationship to Counter-Plaintiffs' faithless servant Counterclaim because both Plaintiff's FLSA claims and the Defendants' Counterclaims "turn[] on the plaintiff's specific behavior"—that is, both the claims and counterclaims implicate "the question [of] whether plaintiff was doing what defendant[] hired [plaintiff] to do during the hours" at issue, and how much pay should result. *Markbreiter v. Feinberg*, No. 09-CV-5573 (LAK), 2010 WL 334887, at *1 (S.D.N.Y. Jan. 29, 2010); *see also Stefanovic v. Old Heidelberg Corp.*, No. 18-CV-2093 (LTS), 2019 WL 3745657, at *2 (S.D.N.Y. Aug. 8, 2019) (finding supplemental jurisdiction where plaintiffs altered tips on customers' receipts); *Roytlender*, 2024 WL 3566998, at *11 (finding supplemental jurisdiction over fraud, faithless servant, and breach of fiduciary duty counterclaims where plaintiff embezzled hundreds of thousands of dollars in kickbacks and stolen funds through various fraudulent schemes).

By contrast, in cases where a plaintiff asserts systemic claims against a defendant and the defendant levies personal counterclaims against the plaintiff, courts in this Circuit generally

conclude that the counterclaims are permissive. *Torres*, 628 F. Supp. 2d at 647 (finding faithless servant counterclaims permissive because they turned on "discrete" allegations against only two plaintiffs, in comparison to plaintiffs' broad "chain-wide" wage-and-hour claims); *Turban v. Bar Giacosa Corp.*, No. 19-CV-1138 (JMF), 2019 WL 3495947, at *4 (S.D.N.Y. Aug. 1, 2019) (finding counterclaim permissive because plaintiff's "claims all relate to Defendants' payment policies writ large" and Defendants' counterclaim "focuses on [plaintiff's] personal relationships with customers and other employees and relates to events that occurred after [plaintiff's] employment with Defendants ended"); *Ozawa v. Orsini Design Assocs., Inc.*, No. 13-CV-1282 (JPO), 2015 WL 1055902, at *12 (S.D.N.Y. Mar. 11, 2015) (finding counterclaim permissive because "[employee's] overtime claims involve the nature of her work at [employer] and the number of hours [employee] spent doing so, while [employer's] counterclaim focuses only on the question whether [employee] was paid for days of leave time that [employee] had already used"); *Cinar v. R&G Brenner Income Tax, LLC*, No. 20-CV-1362 (RPK), 2024 WL 4224046, at *10 (E.D.N.Y. Sept. 18, 2024) (finding counterclaims permissive because they "concern discrete allegations of misconduct pertaining to only one plaintiff . . . while plaintiffs' claims turn on allegations regarding defendants' pay practices common to all . . . employees").

Here, Sasse's FLSA claims and Counter-Plaintiffs' faithless servant counterclaim both turn on Sasse's own work and compensation, and raise "the question [of] whether plaintiff was doing what defendant[] hired [plaintiff] to do during the hours" at issue. *Markbreiter*, 2010 WL 334887, at *1 (S.D.N.Y. Jan. 29, 2010). Sasse argues that Defendants failed to timely pay him "the wages that he earned." AC ¶ 118. Counter-Plaintiffs call into question what, exactly, those wages were. *See* Counterclaims ¶¶ 64–67 (faithless servant counterclaim seeking disgorgement of compensation). "The 'logical relationship' between the complaint and the counterclaim is

[thus] patent." *Markbreiter*, 2010 WL 334887, at *1 (S.D.N.Y. Jan. 29, 2010). Because the faithless servant counterclaim arises out of "the same transaction or occurrence" as Sasse's FLSA claims, it is a compulsory counterclaim for which "no independent basis of jurisdiction is required." *Id.* at *1–2.

Accordingly, the motion to dismiss the faithless servant counterclaim for lack of subject matter jurisdiction is denied.

**B. The Conversion and Misappropriation of Confidential Information Counterclaims Are Permissive**

Counter-Plaintiffs' conversion and misappropriation of confidential information Counterclaims, on the other hand, turn on events that occurred *after* Sasse's employment had already ended. *See* Counterclaims ¶¶ 52–63. "Counterclaim-Plaintiffs owned and possessed tangible and digital property including equipment, hard drives, and production files that Counterclaim-Defendant wrongfully retained and used *after his termination*," Counter-Plaintiffs write in their conversion counterclaim. *Id.* ¶ 52 (emphasis added). And their misappropriation of confidential information counterclaim begins: "*After termination of his employment*, Counterclaim-Defendant knowingly and without authorization retained, accessed, copied, and used confidential information for his own benefit and in a manner adverse to Counterclaim-Plaintiffs' business interests." *Id.* ¶ 61 (emphasis added).

As to these Counterclaims, then, the "only fact common to [Sasse's] FLSA and NYLL claims and Defendants' allegations regarding his conduct *after* termination is that [Sasse] once worked for Defendants." *Turban*, 2019 WL 3495947, at *4. Therefore, even when construing Counter-Plaintiffs' allegations as true, the Court cannot reasonably infer that Sasse's FLSA claims and Counter-Plaintiffs' conversion and misappropriation of confidential information Counterclaims are "so logically connected that considerations of judicial economy and fairness

dictate that all the issues be resolved in one lawsuit.'" *Phoenix Bulk Carriers, Ltd.*, 742 F. Supp. 2d at 489 (citation omitted).

Accordingly, the Court finds that these Counterclaims are permissive.

**C. Still, the Court Exercises Supplemental Jurisdiction Over Those Claims**

However, the analysis does not end there. Whether "a counterclaim is permissive within the meaning of Rule 13 is not dispositive of the constitutional question whether there is federal jurisdiction over the counterclaim,'" *Rosario*, 2013 WL 1144893, at *2 (quoting *Jones*, 358 F.3d at 212) (cleaned up)—a court "must still determine whether the claims fall under its supplemental jurisdiction pursuant to 28 U.S.C. § 1367," *Torres*, 628 F. Supp. 2d at 468 (citing *Jones*, 358 F.3d at 213).

Under Section 1367(a), "district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). "Where, as in this case, a defendant has asserted counterclaims," Section 1367(a) "confers supplemental jurisdiction over those counterclaims that fall within the same case or controversy as either (1) the plaintiff's original claims or (2) the counterclaims asserted under federal law, because all of these claims are 'within [the Court's] original jurisdiction.'" *Arista Recs. LLC v. Lime Grp. LLC*, 532 F. Supp. 2d 556, 581 (S.D.N.Y. 2007) (internal citation and quotation marks omitted).

"A state law claim forms part of the same controversy if it and the federal claim 'derive from a common nucleus of operative fact.'" *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004) (quoting *Cicio v. Does*, 321 F.3d 83, 97 (2d Cir. 2003)); *see also Sanders v. New World Design Build, Inc.*, No. 19-CV-1071 (VSB), 2020 WL 1957371, at *2 n.4

(S.D.N.Y. Apr. 23, 2020) (discussing how "the Second Circuit has continued to rely on the 'common nucleus of operative fact' standard, as have district courts within this circuit," even if the Second Circuit also acknowledged a "loose factual connection" standard in *Jones*, 358 F.3d at 213 n.5). "To determine whether the claims share such a common nucleus, courts 'have traditionally asked whether the facts underlying the federal and state claims substantially overlapped . . . [or] the federal claim necessarily brought the facts underlying the state claim before the court.'" *Berry*, 2024 WL 1908105, at *3 (quoting *Achtman v. Kirby, McInerney & Squire LLP*, 464 F.3d 328, 335 (2d Cir. 2006)) (cleaned up).

Here, the Court exercises supplemental jurisdiction over Counter-Plaintiffs' conversion and misappropriation of confidential information Counterclaims because they share a common nucleus of operative fact with Counter-Plaintiffs' federal Counterclaims. *See Arista Recs. LLC v. Lime Grp. LLC*, 532 F. Supp. 2d at 581. Although the "only fact common to [Sasse's] FLSA and NYLL claims and Defendants' allegations regarding his conduct *after* termination is that [Sasse] once worked for Defendants," *Turban*, 2019 WL 3495947, at *4, the facts undergirding Counter-Plaintiffs' conversion and misappropriation of confidential information Counterclaims "substantially overlap[]" with those underlying Counter-Plaintiffs' Counterclaims under the Computer Fraud and Abuse Act and Defend Trade Secrets Act, *id.* at 3 (quoting *Achtman*, 464 F.3d at 335).

All of these claims turn on Counter-Plaintiffs' allegations that Sasse "wrongfully retained" and then "accessed, copied, and used" information and materials that did not belong to him "for his own benefit" after he was fired. Counterclaims ¶¶ 52, 61; *see id.* ¶¶ 44–51 (CFAA claim alleging that Sasse "knowingly and intentionally accessed Counterclaim-Plaintiffs' devices, computers, and networks without authorization or in excess of authorized access"; *id.*

¶¶ 68–73 (DTSA claim alleging that Sasse "misappropriated . . . production files, unreleased creative content, client lists, marketing data, administrative account credentials, and controlled-access digital assets used by Counterclaim-Plaintiffs in their business and in interstate commerce").

Because Counter-Plaintiffs' CFAA and DTSA Counterclaims are asserted under federal law, within the Court's original jurisdiction, the Court should and does exercise supplemental jurisdiction over their remaining two state law Counterclaims. *See Arista Recs. LLC*, 532 F. Supp. 2d at 581; 28 U.S.C. § 1367(a).

"Satisfying the constitutional 'case' standard of subsection 1367(a), however, does not end the inquiry a district court is obliged to make with respect to permissive counterclaims." *Jones*, 358 F.3d at 214. The Court must also "consider whether any of the four grounds set out in subsection 1367(c) are present to an extent that would warrant the exercise of discretion to decline assertion of supplemental jurisdiction." *Id.* Section 1367(c) provides:

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—
> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

None of these factors apply. Neither of the remaining state law Counterclaims raise novel or complex issues of state law; neither "substantially predominates over" either the CFAA and DTSA claims; and the Court has not dismissed the CFAA or DTSA claims. *See infra* Sections III–IV. The Second Circuit has also conveyed "caution . . . concerning use of subsection

1367(c)(4)." *Jones*, 358 F.3d at 215. In any event, no "exceptional circumstances" warrant its invocation here. 28 U.S.C. § 1367(c).

Therefore, the Court concludes that it possesses supplemental jurisdiction over Counter-Plaintiffs' conversion and misappropriation of confidential information Counterclaims. The motion to dismiss those Counterclaims is also denied.

## III. Counter-Plaintiffs State a CFAA Claim

Next, the Court addresses Counter-Plaintiffs' two federal claims. First, Counter-Plaintiffs assert that Sasse has violated the Computer Fraud and Abuse Act. *See* Counterclaims ¶¶ 44–51. In particular, Counter-Plaintiffs contend that Sasse violated the CFAA by accessing Serenity's Viventium Employee Self-Service portal long after he was fired, and by "retain[ing] administrative credentials to Defendants' full suite of branded digital platforms—Instagram, Twitter, LinkedIn, Canva, TikTok, Adobe Creative Cloud, and Envato Elements—and . . . transmitt[ing] a spreadsheet of those credentials and password markers to Defendants' management." Opp. at 12–13 (citing Counterclaims ¶¶ 22–24).

"The CFAA is principally a criminal statute that prohibits '[f]raud and related activity in connection with computers,' but it also provides a private right of action to '[a]ny person who suffers damage or loss by reason of a violation of this section.'" *Deutsch v. Hum. Res. Mgmt., Inc.*, No. 19-CV-5305 (VEC), 2020 WL 1877671, at *2 (S.D.N.Y. Apr. 15, 2020) (quoting 18 U.S.C. §§ 1030, 1030(g)). "[T]he scope of the civil actions permitted under . . . Section 1030(g), however, has always been limited." *Id.* (quoting *Hancock v. Cty. of Rensselaer*, 882 F.3d 58, 63 (2d Cir. 2018)). To state a claim under the CFAA, Counter-Plaintiffs must allege that Sasse "intentionally accesse[d] a computer without authorization or exceed[ed] authorized access, and thereby obtain[ed] . . . information from any protected computer." 18 U.S.C. § 1030(a)(2)(C)).

They must also allege "economic damages" "aggregating at least $5,000 in value." 18 U.S.C. §§ 1030(c)(4)(A)(i)(I), (g).

"The CFAA defines 'protected computer' as a computer 'used in or affecting interstate or foreign commerce or communication.'" *Williams v. Kelsey*, No. 25-CV-1968 (LDH) (TAM), 2026 WL 1079826, at *7 (E.D.N.Y. Feb. 4, 2026) (quoting 18 U.S.C. § 1030(e)(2)(B)). "Courts have found that computers used to conduct business across state lines qualify as 'protected.'" *LawClick LLC v. Reagan*, No. 20-CV-1369 (JS) (SIL), 2021 WL 724920, at *3 (E.D.N.Y. Jan. 26, 2021), *report and recommendation adopted*, 2021 WL 722413 (E.D.N.Y. Feb. 24, 2021) (collecting cases). As an initial matter, then, taking Counter-Plaintiffs' allegations as true, "Serenity's HR platform" and the computers used to support it qualify as "protected computers" within the meaning of the statute. Opp. at 12–14; *see* Counterclaims ¶¶ 35–37, 46.

What is less certain is whether Counter-Plaintiffs have sufficiently pled that Sasse accessed the Serenity HR system without authorization or exceeded his authorized access. On the one hand, "[t]he law is clear in the Second Circuit that the CFAA imposes liability only on persons who gain access to a protected system when that access was not authorized." *Deutsch*, 2020 WL 1877671, at *3 (citing *United States v. Valle*, 807 F.3d 508, 511–12 (2d Cir. 2015)). In *Valle*, the Second Circuit held "that a person who has permission to access a computer system and later uses that access for an improper purpose has not 'exceed[ed] [his] authorized access.'" *Id.* at *3 (quoting *Valle*, 807 F.3d at 527–28). That is why, "[f]ollowing *Valle*'s reasoning, it has been held that the CFAA 'does not apply to a "so-called faithless or disloyal employee"—that is, an employee who has been granted access to an employer's computer and misuses that access, either by violating the terms of use or by breaching a duty of loyalty to the employer.'" *Fischkoff v. Iovance Biotherapeutics, Inc.*, 339 F. Supp. 3d 408, 419 (S.D.N.Y. 2018) (quoting *Chefs Diet*

*Acquisition Corp. v. Lean Chefs, LLC*, No. 14-CV-8467 (JMF), 2016 WL 5416498, at *6 (S.D.N.Y. Sept. 28, 2016)); *see Apple Mortg. Corp. v. Barenblatt*, 162 F. Supp. 3d 270, 286 (S.D.N.Y. 2016). ("If an employer has given an employee access to the computer and to the relevant files, the employee's subsequent misuse of the information or misappropriation with the intent to compete with his employer is not sufficient to violate the CFAA.").

The Supreme Court has also more recently affirmed this principle: "[A]n individual 'exceeds authorized access,'" the Court concluded, "when he accesses a computer with authorization but then obtains information located in particular areas of the computer—such as files, folders, or databases—that are off limits to him." *Van Buren v. United States*, 593 U.S. 374, 396 (2021). "That focus is consistent with the statute's purpose: to combat 'hacking, i.e., trespass into computer systems or data.'" *Deutsch*, 2020 WL 1877671, at *3 (quoting *Valle*, 807 F.3d at 526). Indeed, as the Second Circuit explained in *Valle*, "'without authorization' most naturally refers to a scenario where a user lacks permission to access the computer *at all*." 807 F.3d at 524 (emphasis added); *see also JBCHoldings NY, LLC v. Pakter*, 931 F. Supp. 2d 514, 523 (S.D.N.Y. 2013) ("The common meaning of 'without authorization' is 'without any permission at all.'")

On the other hand, "an employee may be liable under the CFAA where access to a computer system 'occurs after the employee is terminated or resigns.'" *Fischkoff*, 339 F. Supp. 3d at 419 (citing *Sell It Soc., LLC v. Strauss*, No. 15-CV-970 (PKC), 2018 WL 2357261, at *3 (S.D.N.Y. Mar. 8, 2018)). And here, Counter-Plaintiffs allege just that: that Sasse accessed Serenity's Viventium HR platform long after he had been fired, without authorization. Counterclaims ¶¶ 34–37.

Still, all Counter-Plaintiffs allege is that Sasse logged into Serenity's "Employee Self-Service portal" when his account had been "Inactive." *Id.* ¶ 35. That hardly suggests that he

"lack[ed] permission to access the [system] at all." *Valle*, 807 F.3d at 524 (emphasis added). And although he accessed the system long after he had been fired, an "Employee Self-Service portal" seems to be the very kind of system that former employees should be able to access long after their employment—if only to, as Sasse aptly underscores, access one's "*own* payroll records and tax documents," Reply at 9.

Even though Sasse is alleged to have "misuse[d] that access," *Fischkoff*, 339 F. Supp. 3d at 419, Counter-Plaintiffs do not allege that he "obtain[ed] information located in particular areas of the computer [system]—such as files, folders, or databases—that [were] off limits to him," *Van Buren*, 593 U.S. at 396. Therefore, Counter-Plaintiffs have failed to state a CFAA claim with regard to Sasse accessing Serenity's Viventium HR platform.

Nevertheless, Counter-Plaintiffs do successfully state a CFAA claim by alleging that Sasse "retained administrative credentials to Defendants' full suite of branded digital platforms—Instagram, Twitter, LinkedIn, Canva, TikTok, Adobe Creative Cloud, and Envato Elements—and" then demanded that Defendants transfer certain assets to him in exchange for Defendants "get[ting] their access back" to those accounts. Opp. at 13 (citing Counterclaims ¶¶ 22–24). In this situation, Counter-Plaintiffs have adequately alleged that Sasse had accessed computer systems that were "off limits to him," *Van Buren*, 593 U.S. at 396, and did more than simply "misuse" that access, *Fischkoff*, 339 F. Supp. 3d at 419. Instead, taking the allegations as true and making reasonable inferences in Counter-Plaintiffs' favor, Sasse changed the credentials and locked Counter-Plaintiffs out of their own accounts. *See* Counterclaims ¶¶ 22–24. These actions are "consistent with the statute's purpose: to combat 'hacking, i.e., trespass into computer systems or data.'" *Deutsch*, 2020 WL 1877671, at *3 (quoting *Valle*, 807 F.3d at 526).

Therefore, Counter-Plaintiffs' have stated a CFAA claim. Sasse's motion to dismiss that claim, as described above, is denied.

## IV. Counter-Plaintiffs State a DTSA Claim

Counter-Plaintiffs bring their second federal counterclaim under the Defend Trade Secrets Act. Counterclaims ¶¶ 68–73. "The DTSA provides a private right of action for '[a]n owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.'" *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 383–84 (S.D.N.Y. 2023) (quoting *Zabit v. Brandometry, LLC*, 540 F. Supp. 3d 412, 419 (S.D.N.Y. 2021)); *see* 18 U.S.C. § 1836(b)(1). "To prevail on [a] claim for trade secret misappropriation under the DTSA, a plaintiff must prove that '(1) it possessed a trade secret, and (2) the defendant misappropriated the trade secret.'" *Id.* at 384 (quoting *Democratic Nat'l Comm. v. Russian Fed.*, 392 F. Supp. 3d 410, 447 (S.D.N.Y. 2019)).

In New York, courts consider the following factors—which are "guideposts, not elements," *LivePerson, Inc. v. 24/7 Customer, Inc.*, 83 F. Supp. 3d 501, 514 (S.D.N.Y. 2015)—to evaluate what qualifies as a trade secret under either the DTSA or state law:

> (1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and to [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Integrated Cash Mgmt. Servs., Inc. v. Digit. Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990) (citation omitted).

"Although there is no heightened pleading requirement on actions brought under the DTSA, district courts in this circuit routinely require that plaintiffs plead their trade secrets with sufficient specificity to inform the defendants of what they are alleged to have misappropriated.'" *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (internal citations and quotation marks omitted). However, "[t]he existence, *vel non*, of a trade secret usually is treated as a question of fact." *Chevron U.S.A., Inc. v. Roxen Serv., Inc.*, 813 F.2d 26, 29 (2d Cir. 1987) (collecting cases); *see also PleasrDAO v. Shkreli*, 804 F. Supp. 3d 362, 376–77 (E.D.N.Y. 2025).

Here, Sasse highlights that Counter-Plaintiffs have "included allegations that refer only to general categories of information concerning their business operations, *i.e.*, production files, unreleased creative content, client lists, marketing data, account credentials, and controlled-access digital assets." MTD at 19 (citation omitted). And while Counter-Plaintiffs have indeed "fail[ed] to provide any additional details for many of these broad categories of 'trade secrets,'" *id.*, they do specify a few critical items—namely, "specific files[] and specific named production projects" that they allege "Plaintiff copied, retained, and used without authorization to build a competing venture." Opp. at 19 (citing Counterclaims ¶¶ 27–28) (naming *Divorce Decoded*, *Vaad*, and *Who Tells Your Story* projects). At this stage, especially because determining whether a trade secret exists is usually "the province of the jury," the Court finds that Counter-Plaintiffs have pleaded their claim with just enough specificity. *Better Holdco, Inc.*, 666 F. Supp. 3d at 384 (citing *Chevron U.S.A., Inc.*, 813 F.2d at 29); *see also Town & Country Linen Corp. v. Ingenious Designs LLC*, 556 F. Supp. 3d 222, 274 (S.D.N.Y. 2021).

Counter-Plaintiffs have also just barely alleged that the trade secrets are "related to a product or service used in, or intended for use in, interstate or foreign commerce." *Better*

*Holdco, Inc.*, 666 F. Supp. 3d at 384 (quoting *Zabit*, 540 F. Supp. 3d at 419); *see* 18 U.S.C. § 1836(b)(1)). The Counterclaim itself is conclusory: It merely states that the "trade secrets misappropriated by Counterclaim-Defendant include production files, unreleased creative content, client lists, marketing data, administrative account credentials, and controlled-access digital assets used by Counterclaim-Plaintiffs in their business and in interstate commerce." Counterclaims ¶ 69. But elsewhere in their pleadings, Counterclaim-Plaintiffs explain that at least part of their business involves producing multimedia content for "branded digital platforms" across the Internet—including on Instragram, Twitter, TikTok, and various websites. *Id.* ¶¶ 22–24. At this stage, these allegations are just enough to state a claim.

Accordingly, Counter-Plaintiffs have stated a claim under the DTSA and the motion to dismiss their DTSA claims is denied.

## V. Counter-Plaintiffs State a Conversion Claim

As to their conversion claim, Counter-Plaintiffs allege that Sasse "wrongfully retained and used" Counter-Plaintiffs' "tangible and digital property including equipment, hard drives, and production files" after he was fired. Counterclaims ¶ 52.

"Under New York law, 'conversion is the unauthorized assumption and excise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.'" *eShares, Inc. v. Talton*, 727 F. Supp. 3d 482, 495 (S.D.N.Y. 2024) (quoting *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403–04 (2d Cir. 2006)). To state a claim for conversion, "a plaintiff must allege: '(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its

condition or to the exclusion of the plaintiff's rights.'" *Kirschner v. Bennett*, 648 F. Supp. 2d 525, 540 (S.D.N.Y. 2009) (quoting *Moses v. Martin*, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004)).

Here, Sasse argues that Counter-Plaintiffs "have not sufficiently established that they possess[ed] legal ownership or an immediate right of possession to the alleged stolen property." MTD at 16; *see* MTD at 16–17, 20. Specifically, Sasse contends that Counter-Plaintiffs' allegations support the conclusion that the property belonged to Montebello Media, and that any allegations to the contrary are "conclusory." MTD at 16.

However, Counter-Plaintiffs explicitly allege that "the equipment and media assets" at issue in their conversion claim "were owned by Derech Shalom Center, Inc. and used by Serenity Healthcare Services LLC under shared management." Counterclaims ¶ 53. At this stage, the Court must accept such factual allegations as true. *See Garvey v. Face of Beauty LLC*, 634 F. Supp. 3d 84, 90 (S.D.N.Y. 2022). Although Counter-Plaintiffs refer elsewhere to property owned by Montebello Media, they plausibly—indeed, explicitly—allege that they owned the property at issue in their conversion claim. *See supra* Section I. And, again, at this stage of the litigation, the Court must draw all reasonable inferences in Counter-Plaintiffs' favor. *Garvey*, 634 F. Supp. 3d at 90.

Accordingly, Counter-Plaintiffs' conversion claim survives Counter-Defendant's motion to dismiss.

## VI. Counter-Plaintiffs State a Claim for Misappropriation of Confidential Information

Finally, Counter-Plaintiffs allege a claim for misappropriation of confidential information in the alternative to their DTSA claim. Counterclaims ¶¶ 58–63. They allege that Sasse "knowingly and without authorization retained, accessed, copied, and used confidential

information for his own benefit and in a manner adverse to Counterclaim-Plaintiffs' business interests." *Id.* ¶ 61.

"Because '[t]he elements for a misappropriation claim under New York law are fundamentally the same' as a DTSA claim, 'courts have found that a [c]omplaint sufficiently plead[ing] a DTSA claim . . . also states a claim for misappropriation of trade secrets under New York law.'" *Catalyst Advisors, L.P. v. Catalyst Advisors Invs. Glob. Inc.*, 602 F. Supp. 3d 663, 671 (S.D.N.Y. 2022) (quoting *Iacovacci*, 437 F. Supp. 3d at 380).

Therefore, for the same reasons that Counter-Plaintiffs have stated a claim under the DTSA, they have also stated a misappropriation claim under New York law. *See supra* Section IV.

**CONCLUSION**

For the reasons stated above, the Court DENIES Counter-Defendant's motion to dismiss. Counter-Plaintiffs' CFAA, DTSA, faithless servant, conversion, and misappropriation of confidential information Counterclaims all survive.

The Clerk of Court is respectfully directed to terminate ECF No. 31.

Dated: September 28, 2026
White Plains, New York

SO ORDERED.

Jessica Clarke

JESSICA G. L. CLARKE
United States District Judge